In this case, the petitioner is a single 28-year-old Indonesian citizen. He is ethnic Chinese and a Christian, and he claims to protect the grounds of ethnicity, religion, and imputed political opinion. The main issue, as we see in this case, is whether a reasonable adjudicator would have denied asylum on the record. At the outset, we would like to rebut an assertion that was made in the government's answering brief at the top of page 9, summarizing the background materials submitted by the petitioner on country conditions in Indonesia. The petitioner's documents deal with, and then we go down a few lines, descriptions of discriminatory laws against Chinese Indonesians before the laws were repealed. That assertion is totally inaccurate. Although a few laws might have been repealed, to the best of our knowledge, most of the anti-Chinese laws in Indonesia remain on the books to this very minute. The record is not to the contrary. And I would refer your honors to the administrative record at 654 and 655. It's a newspaper article entitled Indonesia's Chinese Fight Back, and it discusses 50 discriminatory laws against the ethnic Chinese. I'd also like to address several points made in our brief on the issue of substantial evidence. A reasonable adjudicator would be compelled, we believe, to conclude that the petitioner is eligible for asylum. Initially, credibility is presumed in the circuit if the IJS here did not make a specific credibility finding, a conjure of Flores v. INS. We offer an equation for establishing a well-founded fear of future persecution. Specifically, the applicant's past experiences plus pattern of practice evidence plus country conditions equals a well-founded fear of future persecution in this case. Of course, the Supreme Court's decision in INS v. Cardoso Vonseka held that a 10 percent chance of persecution is sufficient to establish a well-founded fear of future persecution. As to past experiences, first, the petitioner testified the last time he renewed his passport in Indonesia. He was discriminated against by a government official, delayed the issuance of his passport for a few hours. He testified that he had to pay a higher fee as opposed to the native or indigenous Indonesians. You know, counsel, I don't think there's a doubt in the world that the record shows that there's been substantial discrimination against Chinese in Indonesia and particularly Chinese Christians. And I think I would, in one of the cases that an IJ had held that there was a pattern in practice. But here, there doesn't seem to be anything that has ever happened to your client, which could be persecution or that he could even probably fear persecution. He apparently comes from a fairly rich and privileged family, and he's gone to school abroad and traveled and been everywhere. But I don't find anything in this record that suggests that he has personally ever suffered any persecution. Well, Your Honor, if there is something, I'd like to hear about it. Well, certainly there are worse cases than this. Well, I mean, he says he and his family members are regular attendees at the church of their choice, Presbyterian Church, that neither he nor any of his family members have suffered any difficulties in attending church or in worshipping according to their faith. Not only is there no evidence of anything happened to him, he says, I go to church regularly with no problem with my family. Well, Judge Trott, the record does show, though, in the country report for 1999, which was the latest. But the question that Judge Fletcher asks is what happened to him. Certainly, Judge. The answer seems to be nothing. The answer is that fortunately for him, not a lot happened. Not a lot. Name one thing that happened. Well, there was some discrimination regarding the passport. He also pointed out that Which he renewed how many times? I think it was four or five, Judge Trott. But he also said that Is this coded ID card? Yes, Judge Fletcher. I was just going to get to that point. And that's corroborated in the article that I cited to you, which is also referred to on page nine of our brief in the Administrative Record at 654, 655. Might also add in that article on this page 655, that I believe it's in the left-hand column, about halfway down, underlined. It does discuss that there have been numerous riots targeting the ethnic Chinese in the 1970s, in 1980, in the 1990s. And the one in 1998 was quite severe. Nobody denies that. We're just talking about your client. Yes, Your Honor. And I wanted to ask something. I don't find anything in this record, and maybe it's there, as to whether he asked for voluntary departure and whether that was granted. Your Honor, there's no voluntary departure in this case because the notice to appear issue within one year of his last entry. Therefore, he's barred at the conclusion of removal proceedings from requesting voluntary departure. And that's the reason that's by statute, section 240, capital B, lower case B. Because he failed to apply on time? No, actually, he filed his asylum application too early is what happened. It's a trick and a trap in immigration law, unfortunately. And if you file too soon the notice to appear issues before one year of his physical presence in the United States, then one, it's ineligible for voluntary departure at the conclusion of removal proceedings. It's a very arcane point. Because he hadn't been here long enough. And he should have filed maybe the 11th month. What we do is we'll file in the 11th month so that it's timely filed, and yet you also get voluntary departure. It is a trick and a trap in immigration law, believe me. It's something you have to learn through practice. But he is not eligible because of the physical presence requirement that wasn't met at the time that the notice to appear issued. But if I may get to pattern of practice evidence, because that can, even if a person doesn't have enough in personal experiences, that's part of the equation I said earlier. In this case, his aunt's shop house was damaged during the 1998 riots. Also, he stated that a family friend's house was ransacked and looted during the 1998 riots. In terms of the country conditions, again, there's still discrimination in Indonesia. There is state-sanctioned, state-sanctioned discrimination. The government has laws. How many countries in the world? That would suggest, then, what you're arguing for is a blanket ruling from this court that any ethnic Chinese are subject to discrimination. Well, Your Honor, we are saying that it has to be looked at on a case-by-case basis. But he does have pattern of practice evidence with respect to similarly situated persons in his country, that is, other ethnic Chinese persons whom he knows, a family member or a friend. And that is part of the equation under immigration law. Madar Maghrabi, which is a leading case on asylum law from the BIA and also codified by regulation in the HCFR. He is also claiming the protected ground of imputed political opinion, which is a perception that many native Indonesians have, that he is somehow the enemy because of who he is, ethnic Chinese and Christian. There's also the Indonesian identification card. I see I have one minute left. Required by law that they must list their religion. He's a Christian. And we do have in the record an article from CNN.com where Muslims asked Christians for their ID cards. That is correct, Your Honor. Yes, it's a country that's 87% Muslim. It's the most populous Muslim country in the world. I see you have 34 seconds, so we'll stop at this time. Thank you. Good morning again, Your Honors. My name is Jeffrey Bernstein, and I represent the government. It is true, well, number one, I know I don't have to remind the Court, but I will anyway, that in order for Mr. Sidwick at NOMO to prevail, he must show that the evidence compels the conclusion that the immigration judge improperly determined that he failed to show a well-founded fear of persecution should he return to Indonesia. As Judge Fletcher indicated, a large component in the immigration judge's decision, and under the law, is that Mr. Sidwick at NOMO did not prove, nor did he allege, essentially, that he'd been persecuted in Indonesia. Nothing happened to him. Nothing has happened to his family. I guess his aunt had her shop house destroyed and a friend had a house destroyed. But as the immigration judge noted, the aunt rebuilt her shop, reopened, and still lives safely in Indonesia. Am I right that the regulations provide that if a pattern and practice of persecution of a group is established, then you don't have to show individualized persecution? There certainly is. This Court has so held, Your Honor, that if there is a pattern and practice. But there is absolutely no pattern and practice of persecution of ethnic Chinese or ethnic Chinese Christians in this case. Well, as I read the record, it's kind of like a pogrom happens every once in a while. When they really want to have someone to blame, they stir up the Indonesians, and we have things like the 1998 riot or the 1960s riot. Your Honor. In the case that we have been talking about that is now deferred, the IJ found a pattern and practice, and then that was reversed by the BIA. Actually, he didn't, Your Honor. He didn't find a pattern of practice. He noted, as you did, that there had been a history of discrimination and some violent outbursts, and he indicated. . . We're talking about this case now. Well, yes. But I'm just saying to you in that other case, the IJ did find on the same facts a pattern and practice. All I'm saying is, Your Honor, is he did not in the prior case find a pattern and practice. In sale? In sale. That's correct, Your Honor. He indicated that although the. . . Go back and argue that case, but it's there. Yeah. Yeah, I'm happy to talk about the immigration judge's finding, but, again, I guess, as you're indicating, I should return to this case. I think that's a good idea for both of us. The evidence of record, particularly the government's documents, show that the discrimination against the Chinese in Indonesia in the 60s started with the then President Suharto, who apparently there was a coup, and President Suharto suspected that the Chinese communists from China were responsible, and so that all kinds of discriminatory laws were passed, and that this government, the government of, I believe it was General Suharto, fomented hatred against the Chinese, which resulted in several riots in the 70s, and I guess the May 1998 riots were a product of, I guess, that process, as well as the fact that Indonesia was suffering from, as all Asia was at that point, severe economic problems, and the people were lashing out at the Chinese, who were perceived to be, and they are, holders of great wealth, and the citizenry thought that every Chinese individual was wealthy and lashed out at them. I guess the point to be made is that after 1998, and the change, certainly after the change of government to President Waleed, or Waheed, I cannot remember exactly how you pronounce his name, the government's attitude has sharply changed. The evidence establishes, again, that, I believe the evidence establishes that, as we cite in our brief, that most of these laws, the discriminatory laws which were passed by General Suharto's regime, have been repealed. Certainly, a great many of them, Chinese news publications are allowed, Chinese language newspapers are now allowed. They weren't before. The Chinese are allowed to take Chinese education now. They weren't before. They're permitted to celebrate festivals. They're permitted to celebrate the Chinese New Year. They weren't before. I guess what I'm saying is that given the change in government, General Waleed is, I believe, a Muslim himself, but he believes in, that people respect each other, and the government has taken steps to make sure that practice is carried out, particularly the record. What are you arguing, that the record before us doesn't compel a conclusion or a finding that there's a pattern or practice such as that? That's absolutely correct, Your Honor. That's the point. Your Honor? We have your point. We have your point. We have your point. We have your point. All righty. Again, the evidence of record establishes no pattern of practice. The evidence of record does not compel a conclusion that Mr. Sudowitkamomo. I'm sorry, Your Honor. It's a tough name, and I'm a little bit dry. That the Petitioner has any problems or ever had any problems or is likely to have any problems. Again, the alien's Chinese Christian friends and his relatives all practice their Christianity without a parent problem. They are all his parents, obviously, and his friends that he's discussed in his brief and in the record are Chinese. Those two that had problems in the 1998 riots of Rebuilton are doing, from all, from the record, very well. Do you have any other points you want to make? I just wanted to indicate that with respect to the allegation that Christians are persecuted, the evidence of record does not compel a conclusion that Christians are persecuted to a great extent. There are. Just to a little extent. Well, there are many sections of the country. Indonesia is a vast country spread out over a vast area. In Jakarta, where Mr. Sudowitkamomo is from. Call him Widget. I will call him Widget. We're the Petitioner. There doesn't appear to be any evidence of persecution of Christians. Again, his family members can practice, et cetera. There are areas, particularly the Malacca Islands, which are fairly far away from Jakarta, where there is a very big conflict between Christians and Muslims. They attack each other regularly. I don't know. I can't imagine that many of these Christians in the Malacca Islands are Chinese. But even if they are, there's a huge conflict between the two of them. But that conflict, which results in discrimination and bad, bad things against Christians by Muslims and bad things and discrimination of Muslims by Christians, is not likely to affect Mr. Widget. It's irrelevant. That's correct, Your Honor. Thank you for bringing to our attention something that's irrelevant. Well, Your Honor, I think it's relevant to their argument. I think it's relevant, and I think it is irrelevant to this case. But I think it's relevant that I bring to your attention. Some of us got your point. We got it. Thank you. Just a couple of quick points. I want to address Judge Fletcher's comment on the sale case. It will be very brief. But I must address this. In the BIA's decision, you're right, Judge Fletcher, the decision says this. We agree with the services contention of the immigration judge Erd in granting the respondent's application for asylum as predicated upon her finding that the respondent has demonstrated a, quote, pattern and practice in Indonesia. Bob, I just need the letter to read it to me. Yes. All right. That is front and center in that case. I want to make that clear. What page was that on? The one we've taken over. No, no, I know. Let's talk page four. Page four. The BIA's decision in sale. That is front and center in that case. And, Judge Fletcher, I'd like to address the other point about if one person gets it, everybody gets it. Sort of what's called the floodgates argument in immigration law. This court has said this. This is Singh V. I want to make sure because this is important to me anyway. All right. In the IJ's decision in that sale case, what I was able to find at ER 60, the court believes that the documentary evidence establishes a pattern and practice in Indonesia of periodic outbreaks of violence directed against the ethnic Chinese, which often rise to the level of persecution. Was there something other than that that she found? I understand she found pattern and practice as described, but I just want to know if we're talking. Oh, yes, Your Honor. A lot of past experiences. I'm sorry. Did she make a finding beyond that statement where she said, I'd make a finding of pattern and practice? I believe she did, Your Honor. Okay. Well, if you don't have it at hand. But in any event, there's a lot of past experiences. You're referring, what, to the BIA decision? Yes, you're referring to the BIA decision with regard to pattern and practice reversed on that point and country admissions, but there's a lot more to the IJ's decision. I understand there's more. Okay. And that would go back to that equation. Real briefly on the so-called floodgates argument. This Court has said, We reject the notion that an applicant is ineligible for asylum merely because all members of the persecuted group might be eligible for asylum. Singh v. INS 94, Fed 3rd, 1353 at 1359 9th Circuit, 1996. Thank you, Counsel. The case just argued is order submitted. We will take a ten-minute recess before hearing the last two cases on the calendar. Thank you.
judges: B. Fletcher,trott, Fisher